Ralph NADER and the Connecticut Citizen Action Group, Plaintiffs,

v.

ALLEGHENY AIRLINES, INC., Defendant.

Civ. A. No. 1346–72.

United States District Court, District of Columbia.

Oct. 18, 1973.

Reuben B. Robertson, III, Washington, D. C., for plaintiffs.

Frank F. Roberson, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHARLES R. RICHEY, District Judge.

This case came on to be heard before the Court, sitting without a jury, and the Court, having considered the evidence introduced at the trial, the stipulations entered into by the parties, and upon consideration thereof including the arguments of counsel as well as the trial briefs, hereby makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

1. Plaintiff Ralph Nader is a citizen of the United States and resides in the District of Columbia.

2. Plaintiff Connecticut Citizens Action Group (hereinafter CCAG), is a non-profit corporation, organized and existing under the laws of the District of Columbia and has its principal place of business in Hartford, Connecticut. It is a public interest advocate for environmental and consumer issues arising in the State of Connecticut.

3. Defendant, Allegheny Airlines, Inc., is a corporation having a principal place of business at the Washington National Airport near Alexandria, Virginia. It is an air carrier and holds a certificate of public convenience and necessity issued by the Civil Aeronautics Board and is regulated by the laws of the United States relating to such carriers and by the rules, regulations and orders promulgated by the CAB in accordance with the Federal Aviation Act of 1958.

4. In the early spring of 1972, CCAG became involved in a controversy over proposed public utility rate increases in Connecticut. CCAG had planned to hold a rate-payers rally on April 28 to raise public support in the Hartford area for CCAG's efforts to oppose pending electric utility rate increases in particular and for the group's consumer rights activities in general. Mr. Nader, who assisted in the organization of CCAG in April 1971 was scheduled to appear in Storrs, Conn. on April 28, 1972. The director of CCAG ascertained that Mr. Nader would be available and willing to appear as the keynote speaker for the rally, which was then planned to be held over the luncheon hour in downtown

Hartford and adequately in advance of Mr. Nader's later appearance that day at Storrs.

5. On Tuesday, April 25, 1972 Plaintiff Nader made a confirmed reservation for Allegheny Flight 864, scheduled to depart Washington National Airport at 10:15 a. m. on April 28, 1972 with arrival at Hartford, Connecticut's Bradley International Airport at 11:15 a. m.

6. In reliance upon Mr. Nader's confirmed reservation on Allegheny's Flight 864 on April 28, 1972, CCAG's representatives began on Wednesday, April 26, 1972 to distribute flyers for the 12:15 p. m. rally on April 28, 1972. CCAG had also planned to use the noontime rally to take advantage of Mr. Nader's great popularity and influence in the State of Connecticut to generate "spill over" contributions in CCAG's 1972 fund drive. Also based on Mr. Nader's commitment the CCAG was able to enlist the appearance of the Mayor of Hartford and President of the City Council at the rally to endorse CCAG's efforts to be allowed to intervene as full parties in the State's utility rate proceedings. As a result of these efforts at least 1,000 people arrived for the rally just before the scheduled stated time.

7. Plaintiff Nader's ticket was picked up from a travel agent in downtown Washington, D. C. on the morning of April 28, 1972. On the same morning he arrived at approximately 10:05 a. m. at the main terminal building of Washington National Airport. He was advised to proceed to Gate 17 on the lower level. There, upon presentation of his confirmed reservation and ticket he was denied boarding on Flight 864 because it had been oversold by the Defendant Allegheny Airlines, Inc.

8. The Plaintiff Nader then inquired of Allegheny Agent at Gate 17, John McDonald, as to whether there were any stand-bys already on board the plane or whether there were any passengers who would volunteer to give him his seat. Mr. McDonald refused to make either inquiry.

9. The Plaintiff Nader informed Mr. McDonald at the departure gate of the likely harm that would occur to him and Plaintiff CCAG if the Defendant refused to honor his confirmed reservation, but all Mr. McDonald did was to offer the Plaintiff Nader another flight to Hartford via Philadelphia on a fifteen-passenger plane which was scheduled to arrive in Hartford at 12:10 p. m., some 55 minutes after the scheduled arrival of Flight 864 in Hartford on April 28, 1972. As a result of Allegheny's conduct, Mr. Nader incurred $7.00 in long distance telephone expenses and $3.00 in the additional cost of a ticket to Boston. (From Boston Mr. Nader travelled by car to Storrs.)

10. CCAG's director informed the crowd at the rally that Mr. Nader could not appear as scheduled. The crowd of 1,000 dwindled to about 200 persons who remained to hear the Mayor, the Council President and CCAG's Director, Mr. Moffett, speak. CCAG lost the contributions expected to be generated both at the rally and by canvassing and direct mail solicitations of persons whose names were to be obtained at the rally or as a result thereof. Furthermore, CCAG suffered extreme and very real embarrassment, loss of professional esteem and prestige throughout the State of Connecticut as a result of Mr. Nader's failure to appear as advertised. CCAG also incurred $50 to send a car to Boston to pick up Mr. Nader and transport him to Storrs.

11. Allegheny Airlines has a practice of systematically overbooking its flights by accepting more confirmed reservations and selling more tickets for a flight than the number of seats which are actually available on its aircraft.

12. Over-booking by Allegheny is substantial. In April, 1972, according to the record herein the company bumped 945 persons, and during the period from January 1969 through August 1972 some 15,929 persons were not accommodated on Allegheny flights for which they had confirmed reservations. During April, 1972, 18 Allegheny flights between

Washington and Hartford were over-sold or over-booked with the result that some 48 confirmed reservation-passengers were left stranded.

13. Allegheny is and was at all times pertinent herein aware of the fact that its over-booking practice inevitably resulted in denials of boarding to some persons on some flights who held confirmed reservations, and it is further aware that this practice does in fact cause severe distress and financial loss to persons who rely upon confirmed reservations.

14. Through advertising and other means Allegheny holds itself out and represents itself to the public that it offers reliable reservation policies which, if available and confirmed, will assure any prospective passenger of a seat on the flight designated in the confirmed reservation.

15. There is nothing in the advertising of the defendant which makes the public aware of the Defendant's practice of intentional over-booking of its flights or the fact that this over-booking practice does in fact create a substantial risk that confirmed reservations will be dishonored. Nor is the public advised in detail of the over-booking practice in the tariffs filed with the CAB or of the fact that all members of the Air Transport Association, of which the Defendant is a member, intentionally sell more tickets than they have seats for their particular flights. In fact, the Court finds that the Defendant and its agents conceal their over-booking practice from the public and furthermore did so in this case, which intentional over-booking resulted in financial harm and damages to each of the Plaintiffs herein.

16. Prior to April 28, 1972 neither Plaintiff was made aware of Allegheny's intentional over-booking policy or of the fact that Flight 864 between Washington and Hartford in particular was intentionally over-booked. The fact that Plaintiff knew from previous experience that other airlines such as American and Eastern over-booked flights, did not make either Plaintiff aware of the fact that the Defendant in the case at bar did this or that it also engaged in such practices.

17. Each Plaintiff relied on the Defendant's confirmation of the Plaintiff Nader's reservation as an assurance that he would be accommodated and allowed to board Flight 864 and as a result of such reliance each of the Plaintiffs were injured by virtue of Mr. Nader's inability to arrive in Hartford, Connecticut as scheduled.

18. The Civil Aeronautics Board has not attempted to directly regulate the reservations practices of Allegheny or any other airline, but it does require all airlines to tender certain compensation to passengers who are denied boarding on a flight. Such compensation represents liquidated damages for "bumping" claims against the carrier, if accepted. CAB regulations specifically contemplate full judicial redress as an alternative means for the vindication of the aggrieved party's rights, at his sole option. 14 C.F.R. § 250.8. (Tr. 160–61).

19. Forthwith upon denying boarding to Mr. Nader, Allegheny conveyed to him a written instrument containing an offer of settlement, acceptable within 60 days, of his claims arising from the incident, thereby acknowledging its actual notice thereof and waiving any requirement for further action on his part within any shorter period.

20. Allegheny's tariff rule requiring written notice of claims within 45 days, if not waived, was literally complied with, since (a) the company's own employee delivered to its offices on the day of the denial of boarding a writing describing the incident and setting forth the amount to be offered to Mr. Nader as liquidated damages, and (b) the tariff does not specify how or by whom the required writing must be given; and (c) a denied boarding transaction is not completed before the tendered compensation is either accepted or rejected by the recipient, and written notice was given to Allegheny by Mr. Nader's representa-

tive contemporaneously with the rejection of its settlement offer. Moreover, by its own terms, the rule is inapplicable to the instant case, which involves a claim for damages arising out of Defendant's discrimination, fraudulent misrepresentation and intentional tortious conduct.

21. The Defendant Allegheny Airlines is a common carrier which is licensed or authorized to do business by the Civil Aeronautics Board, as hereinbefore stated, and is the holder of a certificate of public convenience and necessity. As such it has a public duty and an especially large and high fiduciary obligation to make its policies known to all of its customers with regard to its intentional over-booking. The fact that it conceals such practices in its advertising and otherwise, and, by virtue of its failure and refusal to take reasonable steps to avoid harm to the Plaintiffs herein is tantamount to willful and wanton misconduct which gives rise to and provides a proper basis for each of the Plaintiffs' claims for damages.

### Conclusions of Law

■ 1. This Court has jurisdiction over the subject matter (28 U.S.C. §§ 1331, 1332, 1337), Fitzgerald v. Pan American World Airways, 229 F.2d 499, 502 (2nd Cir. 1956); moreover, the amount in controversy, exclusive of interest and costs, exceeds $10,000.00. The Court also has pendant jurisdiction over any non-federal claims, United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

■ 2. The Plaintiff, Mr. Nader, is entitled to both compensatory and punitive damages under the antidiscrimination provisions of the Federal Aviation Act of 1958, Section 404(b), 49 U. S.C. § 1374(b). Mr. Nader has established a *prima facie* case of unreasonable discrimination: He possessed a confirmed reservation and ticket, and the resultant right to a seat. The Defendant, who intentionally over-sold the seats, did not honor that priority. The

Defendant has failed to sustain its burden of proof that the discrimination was reasonable by demonstrating company policy and why, in this particular case, its policy did not work an "undue or unreasonable prejudice or disadvantage in any respect whatsoever" to Mr. Nader, where the Defendant permitted passengers with subsequent or no reservations to have priority over a passenger with a confirmed reservation who had not been informed of the risks attendant to the Defendant's concealed policy of overbooking. Archibald v. Pan American World Airways, 460 F.2d 14, 16–17 (9th Cir. 1972); Kaplan v. Lufthansa German Airlines, 12 CCH Avi.Law Rep. 17,-933 (E.D.Pa., Civil No. 68–2611, decided 4/9/73); Mortimer v. Delta Air Lines, 302 F.Supp. 276, 278 (N.D.Ill.1969); Wills v. Trans World Air Lines, Inc., 200 F.Supp. 360 (S.D.Cal.1961).

■ 3. The Defendant, through its agents, servants and employees, knowingly and intentionally misrepresented a material fact, namely that Mr. Nader had a guaranteed reservation for a seat, upon which each of the Plaintiffs relied. *Accord,* Isen v. Calvert Corp., 126 U.S. App.D.C. 349, 379 F.2d 126 (1967); *see* Sankin v. 5410 Connecticut Avenue Corp., 281 F.Supp. 524 (D.C.D.C.1968), aff'd sub nom. Benn v. Sankin, 133 U.S. App.D.C. 361, 410 F.2d 1060 (1969), cert. denied, 396 U.S. 1041, 90 S.Ct. 681, 24 L.Ed.2d 685 (1970). In light of all the evidence in this case, the Plaintiffs' reliance was reasonable and resulted in the injuries and damages which they incurred. It was foreseeable that the Defendant's intentional misrepresentation would be relayed to other members of the public and that they would rely upon the Defendant's representation since the Defendant's legal duty is to provide the public with reliable air transportation under its certificate of public convenience and necessity.

4. CCAG is eligible and entitled to recover herein for damages it has incurred due to the Defendant's intentional misrepresentation even though they were not direct parties to the transac-

tion in issue because: (1) the misrepresentation was knowingly and intentionally made; privity of contract is not required here; (2) CCAG was within the class of foreseeable plaintiffs (the class is determined by the Defendant's legal duty to the public at large both under its license and by its better position to prevent injury to the public by full disclosure of its practices affecting the public); (3) CCAG made a reasonable reliance on the misrepresentation and was thereby damaged. *See* Prosser, "Misrepresentation and Third Persons," 19 Vand.L.Rev. 231, 246, 250 (1966); 37 C.J.S. Fraud § 61; 37 Am.Jur.2d, Fraud and Deceit § 298; *Cf.* Rusch Factors, Inc. v. Levin, D.C., 284 F.Supp. 85, 90 (1968).

■ 5. Other than $50 CCAG has not proven its claim for actual damages with sufficient legal precision to permit a specific award of compensatory damages. Even though CCAG probably was less successful in their fund drive due to the loss of prestige and dampening of the drive's momentum when Mr. Nader failed to appear at the rally, their actual loss in fund solicitation is too speculative to provide a basis for an award of compensatory damage. However, the Defendant's intentional misrepresentation did constitute an invasion of CCAG's legal rights, and, therefore, CCAG is entitled to nominal damages of $1. Chesapeake & Potomac Tel. Co. v. Clay, 90 U.S.App.D.C. 206, 194 F.2d 888, 890 (1952). *See,* Cook Industries, Inc. v. Carlson, 334 F.Supp. 809 (D.C.Miss. 1971); Oklahoma Natural Gas Corp. v. Municipal Gas Co. of Muskogee, 113 F. 2d 308 (10th Cir. 1940).

■ 6. Punitive damages are awarded against a tortfeasor to punish him for the good of the community for his outrageous conduct and to deter others from such conduct. Chesapeake & Potomac Tel. Co. v. Clay, 90 U.S.App.D. C. 206, 194 F.2d 888, 891 (1952). Since the Defendant herein intentionally engaged in substantial over-selling, and intentionally did not inform the public of this practice and the attendant risks, and intentionally sought to conceal such information from all its passengers and particularly from the victims of this practice, it is clear that the Defendants acted not only wantonly but with malice. They are, therefore, liable to both plaintiffs for punitive damages for their misrepresentation.

■ 7. Under the Federal Rule and the rule of this district, compensatory damages need not be shown to establish a basis for the assessment of punitive damages. E. g., Wardman-Justice Motors, Inc. v. Petrie, 59 U.S.App.D.C. 262, 39 F.2d 512, 516 (1930). Therefore, although the proven damages of the plaintiffs are a nominal sum, the plaintiffs may recover punitive damges.

■ 8. The forty-five (45) day time within which actions may be maintained against the Defendant as set forth in its tariff on file with the CAB is no bar to maintaining this action because of the following:

(a) Shortly after dishonoring Mr. Nader's reservation on Flight 864, the Defendant sent him a written instrument, giving him sixty (60) days within which to accept in complete settlement of all claims against the Defendant; and

(b) The aforesaid sixty (60) day offer of settlement and tender of liquidated damages was a written acknowledgement of the Defendant's actual notice of Plaintiffs' claims and thereby waived any further action on Plaintiff's part within a lesser period of time; and

(c) The rule is inapplicable to claims for damages for personal injuries arising out of the Defendant's discriminatory, deceitful and intentional tortious conduct; and

(d) The CAB consumers' guide states that passengers have at least 90 days to file a claim, coterminous with the three-month period carriers are required to maintain their ticket records.

*Conclusion*

By virtue of the foregoing, an order will be entered of even date herewith awarding the Plaintiff Nader $10.-00 in compensatory damages and $25,000 as punitive damages of and from the Defendant. The Plaintiff CCAG is awarded $51.00 in nominal damages and $25,000 in punitive damages, of and from the Defendant.