**Ralph NADER and the Connecticut Citizen Action Group, Plaintiffs,**

v.

**ALLEGHENY AIRLINES, INC., Defendant.**

Civ. A. No. 1346–72.

United States District Court, District of Columbia.

Jan. 10, 1978.

---

Reuben B. Robertson, III, Washington, D. C., for plaintiffs.

Frank F. Roberson, William A. Bradford, Jr., Washington, D. C., for defendant.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

This action arose from the denied boarding of the plaintiff Ralph Nader from Allegheny Airlines Flight 864 on April 28, 1972. A trial was held before the Court, sitting without a jury, on September 4 and 10, 1973, and a decision awarding nominal and punitive damages to plaintiff Connecticut Citizens Action Group (CCAG) and compensatory and punitive damages to plaintiff Nader was filed on October 18, 1973. 365 F.Supp. 128. On appeal by the defendant, the Court of Appeals reversed in part and set aside the Court's 1973 judgment. *Nader v. Allegheny Airlines, Inc.*, 167 U.S.App. D.C. 350, 512 F.2d 527 (1975). That decision, insofar as it applied the doctrine of primary jurisdiction to stay plaintiffs' common law misrepresentation claims, was reversed by the Supreme Court in June 1976, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643. In short, the Supreme Court upheld this Court's determination that a bumped passenger, such as plaintiff Nader, need not await a determination by the Civil Aeronautics Board (CAB) before proceeding with his claim of common-law misrepresentation in the federal courts. Subsequently, the Court of Appeals entered an amended judgment on November 10, 1976.

The case is now on remand to this Court for final disposition in accordance with the decisions of the reviewing courts. Additional discovery has been undertaken and additional exhibits pertaining to the issues remaining for decision have been submitted. Upon review of the entire record herein, and in light of the opinions of the Court of Appeals and the Supreme Court, the Court now makes the following Findings of Fact and Conclusions of Law on remand. The Findings of Fact and Conclusions of Law filed by this Court on October 18, 1973, are hereby reaffirmed except to the extent they are inconsistent herewith or with the amended judgment of the Court of Appeals.

I. *Plaintiff Nader's Claim of a Statutory Violation*

1. Section 404(b) of the Federal Aviation Act, 49 U.S.C. § 1374(b) (1970), provides:

No air carrier or foreign air carrier shall make, give, or cause any undue or unreasonable preference or advantage to any particular person, port, locality, or description of traffic in air transportation in any respect whatsoever or subject any particular person, port, locality, or description of traffic in air transportation to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

Neither party disputes that this nondiscrimination provision may be enforced by a private right of action, *Fitzgerald v. Pan American World Airways, Inc.*, 229 F.2d 499 (2d Cir. 1956); *Wills v. Trans World Airlines, Inc.*, 200 F.Supp. 360 (S.D.Cal.1961), and an aggrieved party may recover compensatory damages in a suit brought in the federal courts without prior reference to the CAB.

■ 2. To recover damages pursuant to a Section 404(b) action, an allegedly oversold passenger must first show that the defendant air carrier refused to honor his boarding priority. It is undisputed herein that plaintiff Nader held a confirmed reservation on defendant Allegheny's Flight 864 from Washington, D.C. to Hartford, Connecticut, on April 28, 1972, that he complied with Allegheny's preboarding conditions, that he was entitled to a seat, and that the reservation was not honored by defendant Allegheny because the flight had been overbooked and all seats were occupied. Thus, as the Court of Appeals recognized, plaintiff Nader's priority was undeniably dishonored, and plaintiff therefore established a *prima facie* statutory violation. 167 U.S. App.D.C. at 362, 512 F.2d at 539.

■ 3. Once the plaintiff has established a *prima facie* statutory violation, as plaintiff Nader has done here, "the burden of proving the priority rules and compliance therewith shifts to the carrier." 167 U.S. App.D.C. at 361, 512 F.2d at 538. Thus, unless defendant Allegheny proves by a preponderance of the evidence that it complied with its established boarding priority rules in boarding Flight 864 on April 28, 1972, plaintiff is entitled to judgment for compensatory damages under Section 404(b).

4. The Court finds that defendant Allegheny has proved by a preponderance of the evidence that the appropriate boarding rule to be applied to Flight 864 on April 28, 1972, a gate check-in flight, is found in paragraph 5 of defendant's Passenger Service Manual, Series 6–100. This rule provides:

If the oversale is not known until the flight is being boarded, (this applies particularly where gate check-in is used) the last passenger to arrive at the gate is the oversale and is not permitted to board. Selection is automatic. Do not delay the flight seeking a passenger who would be least inconvenienced.

5. The Court also finds that defendant Allegheny has proved by a preponderance of the evidence that its boarding priority rules further require gate agents to board all passengers holding tickets for the flight with an "OK" written in the "status" column of the ticket, which signifies that the ticketholders have confirmed reservations, regardless of what the computer printout indicates about their status. If a ticketholder does not have an "OK" ticket, but the ticketholder's confirmed reservation status can be ascertained by other means, such as by checking the computerized Passenger Name List, that passenger, too, is to be boarded according to Allegheny's rules.

6. Notwithstanding the applicability of the aforestated boarding priority rules and Agent John McDonald's knowledge thereof, the Court finds that defendant Allegheny has failed to prove by a preponderance of the evidence that Agent McDonald complied with the applicable boarding priority rules in boarding Flight 864 on April 28, 1972. Agent McDonald (the gate agent for Flight 864) testified that after Flight 864 had been boarded to capacity with 100 passengers, Mr. Nader and others holding confirmed tickets appeared at the gate to be boarded. He testified that he then checked the pulled tickets for the passengers on board and found that they all had either "OK" tickets or, in the absence of "OK"

tickets, had confirmed reservations as reflected in the computer. Therefore, he testified, he applied the defendant's boarding priority rules and made the last arriving passengers, including plaintiff Nader, the denied boarding passengers.

Upon consideration of the entire record herein, the Court finds that Mr. McDonald's testimony is neither credible nor trustworthy on the issue of his inspection of each individual ticket to ensure that all boarded passengers held confirmed reservations. Mr. McDonald's testimony on this issue conflicts with two internal Allegheny memoranda (Plaintiffs' Exhibits 4 & 5), which were prepared within a week of the overbooking here in issue and which indicate that at least two persons boarded on Flight 864 held lower priorities than plaintiff Nader (one waitlist and one who had been previously cancelled as a no-show). While defendant contends that these memoranda do not contradict Mr. McDonald's testimony because the tickets of these lower-priority passengers may have been marked "OK" notwithstanding their recorded status—presumably as a result of a ticketing error—the Court finds this argument wholly unpersuasive. In view of the failure of defendant to introduce into evidence the actual tickets of the passengers in question, the Court cannot conclude that defendant has sustained its burden of proof with regard to the speculative existence of an "OK" marking on the tickets in question. Moreover, the Court is not persuaded that Mr. McDonald actually, or even could have, inspected all the tickets for Flight 864 in the short time available and under the pressures extant at that time. Accordingly, the Court finds that defendant Allegheny has failed to sustain its burden of proving that it complied with its boarding priority rules.

7. The Court further finds that plaintiff Nader has sustained his burden of proving that Allegheny's failure to comply with its boarding priority rules proximately caused his damages. While there were apparently two oversold passengers who had arrived at the gate prior to plaintiff Nader and only two boarding discrepancies, it is clear from the entire record that at least one of the two "prior" oversold passengers would have permitted plaintiff Nader to board Flight 864 if the two boarding discrepancies had properly been discovered. Defendant offered no evidence to the contrary, and the Court therefore concludes that plaintiff proved by a preponderance of the evidence that he would have been boarded on Flight 864 if the boarding discrepancies had been discovered.

8. In view of the foregoing, the Court must conclude that defendant Allegheny violated section 404(b) of the Federal Aviation Act by its failure to board plaintiff Nader in accordance with defendant's own established boarding priority rules, and plaintiff Nader is therefore entitled to recover compensatory damages in the amount of $10.00—$7.00 for long-distance telephone calls and $3.00 for the extra cost of a ticket to Boston.

II. *Plaintiff Nader's Fraudulent Misrepresentation Claim*

9. This Court's judgment in favor of plaintiff Nader on his claim of fraudulent misrepresentation has been vacated, and this Court has been directed by the United States Court of Appeals for the District of Columbia Circuit to "reconsider the issue of fraudulent misrepresentation in light of the opinion[s] of the Supreme Court" and of the Court of Appeals. (United States Court of Appeals, Amended Judgment of November 10, 1976).

10. Pursuant to the Court of Appeals' opinion, this Court must, and does, find that Allegheny made no affirmative misrepresentations to plaintiff Nader (*Nader v. Allegheny Airlines, Inc.*, 167 U.S.App. D.C. 350, 365, 512 F.2d 527, 542 (1975)). Further, this Court must, and does, find that Allegheny owed Nader no duty of full disclosure as a fiduciary (*Nader v. Allegheny Airlines, Inc.*, 167 U.S.App.D.C. 350, 375, 512 F.2d 527, 552 (1975)). What this Court must decide is whether Allegheny's failure to disclose its overbooking policies to plaintiff Nader was a *fraudulent* misrepresentation.

11. The elements of the common-law tort of fraudulent misrepresentation that a plaintiff must prove in order to recover are:

(1) A false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with the intent to deceive (5) with action taken in reliance upon the representation.

*Nader v. Allegheny Airlines, Inc.*, 167 U.S. App.D.C. 350, 364, 512 F.2d 527, 541 n.32 (1976). In addition, since the Court of Appeals has held that defendant Allegheny did not *affirmatively* represent to plaintiff that he had a *guaranteed* seat on Flight 864, 167 U.S.App.D.C. at 365, 512 F.2d at 542, plaintiff Nader must prove that "Allegheny had a duty to disclose the possibility that its policy of deliberate overbooking could alter [public expectations of the meaning of 'confirmed reservation']." *Id.* The Court finds that plaintiff Nader has proved all of these elements by a preponderance of the evidence.

12. *Falsity.* It is undisputed that defendant Allegheny communicated to plaintiff that he had a "confirmed reservation" on Flight 864 on April 28, 1972. It is also undisputed that defendant at no time (not in its tariffs, advertising, or other communications to the public) communicated to the plaintiff the existence of its overbooking practice. Defendant contends that a reasonable person would recognize that a "confirmed reservation" is not an absolute guarantee, but rather is a "reasonable assurance," of being flown, because any given flight may be cancelled as a result of meteorological conditions, mechanical problems, or the like. Defendant further contends that plaintiff had such a "reasonable assurance" of being flown on Flight 864 on April 28, 1972, notwithstanding defendant's overbooking policy, because only a very small percentage of reservation-holders were ever bumped.

The Court agrees with defendant's first contention, but disagrees entirely with its second contention. The "reasonable assurance" of flight that the term "confirmed reservation" connotes is a guarantee of flight subject only to contingencies beyond the control of the airline. The expectation of a reasonable person receiving a "confirmed reservation" is that the airline will do everything within reason to assure that the reservation-holder is flown on the flight for which he has a "confirmed reservation." Merely because any reservation is necessarily subject to unforeseen and uncontrollable contingencies is not license for the airline deliberately to impose its own additional contingencies on the "confirmed reservation," and no reasonable person would interpret the term "confirmed reservation" to incorporate such a license. *Cf. British Airways Board v. Taylor*, 1 All E.R. 65 (House of Lords 1976). The Court thus finds that defendant's nondisclosure of its overbooking practice was misleading and created a false understanding as to the chance of being flown on Flight 864.

13. *Materiality.* A material fact is one to which a reasonable person might attach importance in choosing his course of action, *see* W. Prosser, *Law of Torts*, § 108, at 719 (4th ed. 1971); in other words, it is a fact that could reasonably be expected to influence the conduct of a person with respect to the transaction in question. *See* ALI, *Restatement of Restitution* § 8(2) (1937).

The Court finds that the fact of the existence of defendant Allegheny's overbooking practice was such a material fact. There can be no doubt that the very essence of a "confirmed reservation" is the assurance of flight capacity. Thus, even though defendant contends that the statistical probability of any given passenger being bumped is not substantial, the knowledge that bumping is a possibility might well, for example, influence a reasonable person to arrive earlier for the flight than he otherwise would have. Moreover, defendant's contention that the fact of the existence of its overbooking practice is not material and would not likely influence passengers' behavior is irreconcilable with its admission in oral argument before the Supreme Court that Allegheny might well lose substantial business if it unilaterally (*i. e.*, without like

action by other airlines) notified passengers of its overbooking practice.

14. *Knowledge of Falsity.* Defendant Allegheny clearly knew that its representation to plaintiff Nader that he had a "confirmed reservation" was false and misleading because it knew that its practice of overbooking subjected Mr. Nader's reservation to the risk of being dishonored.

15. *Intent to Deceive.* There can be no doubt that the nondisclosure of the existence of defendant's overbooking practice was the result of a conscious and deliberate policy implemented by Allegheny in order to deprive passengers of information about its overbooking practice so as not to distinguish Allegheny's reservation practices from those of its competitors.

█ 16. *Reliance.* Plaintiff Nader relied on his confirmed reservation as an assurance that he would be accommodated on Allegheny's flight, and the Court finds that such reliance was reasonable. Prior to April 28, 1972, plaintiff Nader was unaware of Allegheny's intentional overbooking policy. Although he knew from prior experience that other airlines had occasionally bumped passengers with confirmed reservations, he was unaware of Allegheny's overbooking practice, especially since the other airlines had always explained their oversales as purely accidental rather than the result of a deliberate overbooking practice. If Allegheny had revealed the existence of its overbooking practice to Mr. Nader, the Court finds that because of the importance that he attached to the fulfillment of his speaking engagement in Hartford, he would have taken appropriate steps to protect against the risk of bumping, such as arriving earlier at the gate, arranging for an earlier flight, or arranging an alternative way to travel to Hartford. Allegheny's purpose in making confirmed reservations is to induce just such reliance by persons making travel arrangements, and there is no basis to assume that Mr. Nader should have realized that his reservation was subject to the risk of overbooking. For these reasons, the Court finds that plaintiff Nader justifiably relied on defendant's repre-

sentation that he had a "confirmed reservation" as a reasonable person would construe that term. *See* Finding # 12 *supra.*

█ 17. *Duty.* It is well-established in this jurisdiction that:

[A] statement in a business transaction, which, while stating the truth as far as it goes, the maker knows or believes to be materially misleading because of his failure to state qualifying matter is a fraudulent misrepresentation; also that a statement containing a half-truth may be as misleading as a statement wholly false and thus that a statement which contains only those matters which are favorable and omits all reference to those which are unfavorable is as much a false representation as if all the facts stated were untrue. . . .

*Borzillo v. Thompson,* 57 A.2d 195, 197–98 (D.C.Mun.App.1948). Thus, "concealment or suppression of a material fact is as fraudulent as a positive direct misrepresentation." *Andolsun v. Berlitz School of Languages, Inc.,* 196 A.2d 926 (D.C.App.1964); *Baker v. Baker,* 54 App.D.C. 214, 217, 296 F. 961, 964 (1924). *See Restatement (Second) of Torts* § 529 (1977). It is also well-established that there is a *duty* upon one who undertakes to speak "not only to state truly what he tells" but also not to "suppress or conceal any facts within his own knowledge which materially qualify those stated. If he speaks at all he must make full and fair disclosure." *Kapiloff v. Abington Plaza Corp.,* 59 A.2d 516, 518 (D.C.Mun.App.1948). *Accord, Tucker v. Beazley,* 57 A.2d 191, 193 (D.C.Mun.App.1948).

█ In the instant case, defendant Allegheny intentionally failed to disclose to plaintiff Nader information within defendant's possession—the existence of its overbooking practice—*see* Finding # 15 *supra,* which materially qualified the meaning of its statement to plaintiff Nader that he had a "confirmed reservation," *see* Finding # 13 *supra* ; and this omission was misleading, *see* Finding # 12 *supra,* and defendant knew it to be so, *see* Finding # 14 *supra.* Thus, defendant Allegheny had a *duty* to disclose the existence of its over-

booking practice and its failure to do so subjects it to liability for the common-law tort of misrepresentation.

18. Plaintiff Nader's injury as a result of his reliance on defendant's misrepresentation was $10.00—$7.00 for long-distance phone calls and $3.00 for the extra cost of a ticket to Boston. Since plaintiff is entitled to recover these damages from defendant on the basis of both the common-law tort of fraudulent misrepresentation and the nondiscrimination provision of 49 U.S.C. § 1374(b), see Finding # 8 supra, defendant's total liability to plaintiff Nader for compensatory damages will be $10.00.

### III. Plaintiff CCAG's Fraudulent Misrepresentation Claim

19. This Court, in its initial opinion, held that plaintiff Connecticut Citizens Action Group (CCAG), the sponsor of the rally in Hartford to which plaintiff Nader was travelling on April 28, 1972, was entitled to recover its damages for reliance on defendant Allegheny's fraudulent misrepresentation that plaintiff Nader had a "confirmed reservation" despite the fact that plaintiff CCAG was not a direct party to the transaction in issue. 365 F.Supp. at 132–33. On appeal, the Court of Appeals reversed this holding on the ground that plaintiff CCAG was too remote from the transaction to be owed a duty by defendant Allegheny; and, it held, in the absence of such a duty, a plaintiff may not recover even if all the elements of the common-law tort of fraudulent misrepresentation have been proved. 167 U.S.App.D.C. at 372, 512 F.2d at 549.

20. On this remand, plaintiff CCAG has asserted that the evidence at trial proved (1) that its director, Toby Moffett, directly communicated on the phone with defendant Allegheny prior to April 28, 1974, "to confirm that Mr. Nader had a reservation" on Flight 864, and (2) that defendant's representative replied affirmatively without any disclosure of Allegheny's overbooking practice. Plaintiff CCAG contends that defendant's direct assurance to it that plaintiff Nader had a reservation on Flight 864 brings CCAG within the scope of defendant's duty.

21. The Court finds credible Mr. Moffett's testimony that he called Allegheny and that it directly represented to him that plaintiff had a reservation on Flight 864 on April 28, 1972. Mr. Moffett testified, however, that he "just" called and asked whether plaintiff Nader had such a reservation. There is absolutely no indication that Mr. Moffett identified himself, his organization, or his reason for calling, and the Court therefore finds that Mr. Moffett did not make such an identification to the Allegheny representative with whom he spoke.

22. In view of Mr. Moffett's failure to identify himself, his organization, or the reason for his call in any way, the Court must, under the standards articulated by the Court of Appeals herein, see 167 U.S. App.D.C. at 370–72, 512 F.2d at 547–49, conclude that plaintiff CCAG was not a member of the class of persons to whom defendant Allegheny's duty extended. Mr. Moffett's unidentified phone call does not change the fact that "[CCAG] was not identified to Allegheny until this law suit was instituted," and that "Allegheny had no special reason to know of CCAG's reliance or even of its existence." 167 U.S.App.D.C. at 372, 512 F.2d at 549. Since " 'the line [of duty] is definitely drawn' where the plaintiff is unidentified and the defendant has no special reason to expect that he may act in reliance," 167 U.S.App.D.C. at 371, 512 F.2d at 548, quoting Prosser, Misrepresentations and Third Persons, 19 Vand.L.Rev. 231, 251 (1966), Mr. Moffett's phone call was not sufficient to bring CCAG within the scope of defendant's duty.

### IV. Plaintiffs' Entitlement to Punitive Damages on Their Fraudulent Misrepresentation Claims

23. Both plaintiff Nader and plaintiff CCAG pray this Court to assess punitive damages against the defendant for its fraudulent misrepresentation. Since only plaintiff Nader is entitled to recover from Allegheny for its fraudulent misrepresentation, the Court can only consider the appropriateness of a punitive damages award to plaintiff Nader.

24. In its initial opinion, the Court held that punitive damages were appropriately assessed against defendant Allegheny because defendant acted wantonly and with malice in intentionally overselling, intentionally not disclosing the existence of such overselling, and intentionally concealing information about this practice from its passengers. 365 F.Supp. at 133. On appeal, the Court of Appeals reversed the award of punitive damages and remanded the issue to this Court for reconsideration of the appropriateness of punitive damages, particularly in light of any "good faith" defense that might be proffered by the defendant.

25. The Court of Appeals specifically indicated that this Court should consider on remand "whether Allegheny reasonably believed that its policies were completely lawful and in fact carried the approval of the [Civil Aeronautics] Board." 167 U.S.App. D.C. at 374, 512 F.2d at 551–52. While there can be no doubt that the practice of overbooking was specifically sanctioned by the CAB at the time plaintiff Nader was bumped, the Court finds that Allegheny's policy of nondisclosure with respect thereto was not approved by the CAB.

 Defendant bases its "good faith" argument primarily on the CAB's 1967 rejection of a proposed rule that would have required carriers to give passengers holding confirmed reservations notice of an overbooked condition 12 hours prior to scheduled flight time. In rejecting this proposed notice requirement, the Board stated:

> The effect of the notice would be to seriously curtail the practice [of deliberate overbooking]. Thus, carriers would not overbook if they were required to advise passengers of their overbooked status twelve hours prior to flight time in view of the resultant confusion, alarm, bitterness, and cancellation of reservations. . . . Had the requirement proposed in EDR–95 been in effect, it is manifest that a very sizeable number of persons would have been needlessly alarmed by the notification of their overbooked status and that reservations would have been cancelled on flights which actually could have accommodated these passengers.

CAB Notice EDR–109, Defendant's Exhibit D, at 5–6 (January 10, 1967). The specific reasons given by the Board for rejecting the proposed requirement—confusion, alarm, bitterness, and cancellations—are by-and-large unique to the requirement of relatively short notice for specific flights. The general disclosure of the practice of overbooking would not necessarily, or even likely, give rise to the same problems, as indicated by the Board's recent imposition of an interim general notice requirement without a flight-specific notice requirement. See CAB Regulation ER–987, 42 Fed.Reg. 12,420 (March 4, 1977). Accordingly, the Court concludes that the Board's rejection of its proposed 12-hour notice requirement in no way sanctioned the absolute and wanton failure of Allegheny to provide any notice of its overbooking practice while continuing to assure passengers that they had "confirmed reservations."

26. Defendant also contends that, even if its policy of nondisclosure were not in fact sanctioned by the Board, it nevertheless "reasonably believed" that such nondisclosure was lawful and carried the approval of the Board. In support of this contention, defendant has introduced the deposition of its current President, Mr. E. I. Colodny, in which he stated that he "assumed" that the Board's rejection of the 12-hour notice requirement "suggested that" general nondisclosure "was an acceptable practice." The Court has considered this testimony, notwithstanding plaintiffs' objection to the admission of this deposition as hearsay not within any of the exceptions to Fed.R.Evid. 801 or 803. The Court finds this recent, self-serving characterization of defendant's interpretation of the Board's 1967 action to be without any appreciable probative value. Moreover, even if Allegheny in fact believed that the Board's 1967 action impliedly sanctioned the nondisclosure policy in effect in 1972, this belief would have been patently unreasonable. Finding no other credible evidence in the record that Allegheny's implementation of its nondisclosure

policy was in "good faith," the Court must reject defendant's "good faith" defense to the imposition of punitive damages.

■ 27. Upon reconsideration of the entire record herein, the Court reaffirms its conclusion that punitive damages are appropriately assessed against defendant Allegheny for its fraudulent misrepresentation to plaintiff Nader that he had a "confirmed reservation" on Flight 864. *First*, it is well-established in this jurisdiction that "proof of fraudulent misrepresentation is itself sufficient to support an award of punitive damages, because of the state of mind rendering it fraudulent." *Day v. Avery*, 548 F.2d 1018, 1029 n.58 (D.C.Cir.1976), *citing Harris v. Wagshal*, 343 A.2d 283, 288 (D.C. App.1975), and *District Motor Co. v. Rodill*, 88 A.2d 489, 492–93 (D.C.Mun.App.1952).

*Second*, even if this principle were not applicable to the instant case, this case is plainly an appropriate case for the imposition of punitive damages against the defendant. The Court of Appeals expressly recognized in this case that it is appropriate to award punitive damages "to punish a defendant for the outrageous nature of his conduct and to deter the defendant and others from engaging in the same or similar acts." 167 U.S.App.D.C. at 374, 512 F.2d at 549. And, the following year in *Knippen v. Ford Motor Co.*, 178 U.S.App.D.C. 227, 236, 546 F.2d 993, 1002 (1976), the Court of Appeals held that punitive damages are appropriate, even in the absence of actual malice, if the "defendant act[s] with such conscious and deliberate disregard of the consequences of his actions to others that his conduct is wanton." Here, this Court has found that Allegheny's nondisclosure of the existence of overbooking practice was the result of a conscious and deliberate policy, the intent of which was to deprive passengers of material information in order not to distinguish defendant Allegheny from its competitors. *See* Finding # 15 *supra*. Allegheny implemented this policy of nondisclosure despite its knowledge that its practice of overbooking can and does result in the disruption of passengers' personal and business plans, even the loss of

business opportunities, as well as severe inconvenience to passengers who, because of their reliance on defendant's representations with regard to "confirmed reservations," are deprived of the opportunity to take steps to protect themselves from the risk of bumping. The Court therefore finds that defendant Allegheny wantonly implemented its policy of nondisclosure and misrepresentation in conscious, deliberate, and callous disregard of the effect of its policy on its passengers, including plaintiff Nader.

■ 28. Defendant has suggested two additional reasons why punitive damages are inappropriate in the instant case: First, it contends that nondisclosure was "a common industry practice," and that this fact precludes a finding of wantonness or outrageousness. Second, it contends that since the Board has recently managed general disclosure about the practice of overbooking, the imposition of punitive damages in this case would have no deterrent value.

■ The Court rejects both of these arguments. The mere fact that a fraudulent practice is common-place in a particular industry in no way deprives that practice of its outrageous character. Indeed, the more widespread the practice, the more appropriate is an award of punitive damages. Similarly, the fact that the Board has now adopted an interim rule requiring disclosure of all airlines' overbooking practices in no way vitiates the deterrent effect of a punitive damages award. Such an award will serve not only to deter future fraudulent misrepresentations with respect to reservation practices, but will also serve to deter defendant Allegheny from engaging in similar types of misrepresentations in other aspects of its business.

■ 29. Having concluded that punitive damages are appropriately awarded herein, the Court must determine the appropriate amount of punitive damages to be awarded. In its initial decision, this Court assessed punitive damages in the amount of $50,000 against defendant Allegheny—$25,-000 in favor of plaintiff Nader, and $25,000 in favor of plaintiff CCAG. Upon reconsid-

eration of the entire record herein, including defendant's submissions and arguments with respect to its asserted "good faith" defense, the Court concludes that an award of $15,000 punitive damages is appropriate in the circumstances of this case. In making this determination, the Court is guided by the considerations set forth in *Afro-American Publishing Co. v. Jaffe*, 125 U.S. App.D.C. 70, 83, 366 F.2d 649, 662 (1966); *Town Center Management Corp. v. Chavez*, 373 A.2d 238, 245–46 (D.C.App.1977); and *Harris v. Wagshal*, 343 A.2d 283, 288 (D.C. App.1975). The Court finds that an award of $15,000 in punitive damages will adequately serve to punish defendant Allegheny for its willful and wanton policy of nondisclosure and misrepresentation and will adequately serve to deter defendant from engaging in such practices in the future. The Court is aware that in this jurisdiction it is appropriate in assessing punitive damages to consider the amount of attorneys' fees incurred by the prevailing plaintiff in the course of this litigation, *Afro-American Publishing Co. v. Jaffe, supra; Town Center Management Corp. v. Chavez, supra,* and the Court recognizes that the award of $15,000 will not fully compensate plaintiff Nader for the value of the many, many hours expended by his able counsel in pursuing this litigation to a successful conclusion. Nevertheless, in the circumstances of the present case, the Court concludes that the award of punitive damages should be limited to an amount adequate for the purposes of punishment and deterrence, and the Court concludes that the award of $15,000 in punitive damages is fair and reasonable and appropriate to satisfy the objectives of the law in applying punitive damages.

30. An Order in accordance with the foregoing will be issued of even date herewith.