626 F.2d 1031

**Ralph NADER, Connecticut Citizen Action Group**

v.

**ALLEGHENY AIRLINES, INC., Appellant.**

**No. 78–1251.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 28, 1979.

Decided May 16, 1980.

Rehearing Denied June 18, 1980.

---

**3.** *See United Steelworkers of America v. Gulf Navigation Co.,* 363 U.S. 574, 584, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960).

Frank F. Roberson, Washington, D. C., with whom William A. Bradford, Jr., Washington, D. C., was on brief for appellant.

John Cary Sims, Washington, D. C., with whom Alan B. Morrison, Washington, D. C., was on brief for appellee.

David R. Murchison and James E. Landry, Washington, D. C., were on brief for amicus curiae urging reversal.

Before MacKINNON, ROBB and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

This is an appeal by Allegheny Airlines from a judgment of the District Court awarding the plaintiff Ralph Nader compensatory and punitive damages for fraudulent misrepresentation in the sale of an airline ticket.

The facts giving rise to Nader's claim are not disputed. He was scheduled to address a rally in Hartford, Connecticut at noon on April 28, 1972. On April 25, 1972 he reserved a seat on Allegheny flight 864, scheduled to depart from Washington, D. C. for Hartford at 10:15 A.M. on April 28. His reservation was a "confirmed reservation". He arrived at the boarding and check-in area approximately five minutes before the scheduled departure time but was told by Allegheny's agent that he could not be accommodated on flight 864 because all the seats were occupied. He was offered an alternative air taxi flight by way of Philadelphia but he decided not to accept it because of uncertainty as to whether he would arrive in Hartford in time for the

noon rally. As a result he was prevented from attending the rally.

The Allegheny agent at the Washington check-in area tendered to Nader the Denied Boarding Form required by CAB regulations (14 C.F.R. § 250.9). This form notifies holders of tickets on flights that are "oversold" that they are entitled to compensation from an airline if they are "bumped", that is, denied transportation. Nader told the agent that he did not need the form because he already had one. In fact, he had received such a form when he was bumped from an American Airlines flight on April 23, 1972, two days before he made his reservation on Allegheny. Six months before that he and five other people had been bumped by Eastern Airlines. On both occasions he held a confirmed reservation.

Pursuant to CAB regulations Allegheny mailed to Nader a check in the amount of $32.41 as denied boarding compensation. Nader's attorney returned the check to Allegheny, together with a letter characterizing the denied boarding compensation as a "wholly inadequate offer of settlement".

On July 7, 1972 Nader filed suit in the District Court, asserting Allegheny's liability on two theories: (1) a common law action based on fraudulent misrepresentation in that Allegheny failed to inform Nader of its "booking practices" and (2) a statutory action under section 404(b) of the Federal Aviation Act, 49 U.S.C. § 1374(b), arising from Allegheny's alleged failure to afford Nader the boarding priority specified in its rules, filed with the Civil Aeronautics Board pursuant to 14 C.F.R. § 250.3.

The District Court, sitting without a jury, entered a judgment for Nader on both claims, and awarded him a total of $10.00 in compensatory damages and $25,000 in punitive damages. *Nader v. Allegheny Airlines, Inc.*, 365 F.Supp. 128 (D.D.C.1973). On appeal this court reversed. *Nader v. Allegheny Airlines, Inc.*, 167 U.S.App.D.C. 350, 512 F.2d 527 (1975). The judgment based on Allegheny's alleged violation of section 404(b) was reversed and the District Court was instructed to make new findings of fact and conclusions of law. The award of puni-

tive damages on the common law claim was reversed. We pointed out that "[s]ince punitive damages require a finding of malice or reckless disregard for the rights of others, the defendants' motivations are crucial"; but "the trial judge never considered whether Allegheny reasonably believed that its policies were completely lawful and in fact carried the approval of the Board." *Id.* at 374, 512 F.2d at 551. We directed the District Court to award punitive damages "only on the terms set forth in this opinion." *Id.* at 375, 512 F.2d at 552. The award of punitive damages on the statutory claim was reversed on the ground that Allegheny's conduct in applying its boarding priority rule contained no elements of intentional wrongdoing or conscious disregard for Nader's rights. Finally, we held that under the doctrine of primary jurisdiction the CAB must be allowed to determine in the first instance whether failure to disclose the practice of overbooking was deceptive within the meaning of section 411 of the Federal Aviation Act, 49 U.S.C. § 1381. The District Court was instructed to stay further action on this issue pending reference to the CAB.

The Supreme Court of the United States reversed the order of this court granting a stay to give the CAB an opportunity to act. *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976). The Court concluded that the common law action could be heard by the trial court without prior reference to the CAB. Accordingly, we entered an amended judgment and the case was remanded to the District Court.

On remand the District Court found that Allegheny violated section 404(b) of the Act, 49 U.S.C. § 1374(b), by its failure to board Nader in accordance with its own priority boarding rules. For this the court awarded him $10.00 in compensatory damages. The court also found that Allegheny's failure to notify Nader of the chance that he would not be seated constituted fraudulent misrepresentation, and that "defendant Allegheny wantonly implemented its policy of nondisclosure and misrepresentation in conscious, deliberate, and callous

disregard of the effect of its policy on its passengers, including plaintiff Nader." The court awarded Nader $15,000 in punitive damages "to punish defendant Allegheny for its willful and wanton policy of nondisclosure and misrepresentation and . . . to deter defendant from engaging in such practices in the future." *Nader v. Allegheny Airlines, Inc.*, 445 F.Supp. 168, 178, 179 (D.D.C.1978). Compensatory damages on the claim were assessed at $10.00.

On this appeal Allegheny challenges only the award of compensatory and punitive damages on the claim based upon fraudulent misrepresentation.

Nader's reservation was not honored because Allegheny had accepted more reservations for flight 864 than it could accommodate. In other words, the flight had been "overbooked". In its opinion in *Nader v. Allegheny Airlines, supra*, the Supreme Court discussed the practice of overbooking:

[O]verbooking is a common industry practice, designed to ensure that each flight leaves with as few empty seats as possible despite the large number of "no-shows"—reservation-holding passengers who do not appear at flight time. By the use of statistical studies of no-show patterns on specific flights, the airlines attempt to predict the appropriate number of reservations necessary to fill each flight. In this way, they attempt to ensure the most efficient use of aircraft while preserving a flexible booking system that permits passengers to cancel and change reservations without notice or penalty. At times the practice of overbooking results in oversales, which occur when more reservation-holding passengers than can be accommodated actually appear to board the flight. When this occurs, some passengers must be denied boarding ("bumped"). The chance that any particular passenger will be bumped is so negligible that few prospective passengers aware of the possibility would give it a second thought. In April 1972, the month in which petitioner's reservation was dishonored, 6.7 confirmed passengers per 10,000 enplanements were denied boarding on domestic flights. For all domestic airlines, oversales resulted in bumping an average of 5.4 passengers per 10,000 enplanements in 1972, and 4.6 per 10,000 enplanements in 1973. In domestic operations respondent oversold 6.3 seats per 10,000 enplanements in 1972 and 4.5 seats per 10,000 enplanements in 1973. Thus, based on the 1972 experience of all domestic airlines, there was only slightly more than one chance in 2,000 that any particular passenger would be bumped on a given flight. [footnotes omitted]

426 U.S. at 293–94, 96 S.Ct. at 1982.

The issues presented in this case must be considered in context with the extended consideration which the Civil Aeronautics Board has given to the practice of overbooking.

In 1967, after notice and comment in a rulemaking proceeding, the Board rejected a proposal to include in its rules provisions requiring notice to passengers of an overbooked condition on flights for which they hold tickets. Instead of such a provision the Board promulgated part 250 of its regulations, 14 C.F.R. § 250, which permitted overbooking practices to continue on condition that "carriers file tariffs providing prompt, effective and adequate compensation to the denied boarding passengers". In an explanatory statement the Board made its views on overbooking clear to the airlines and to the public. In short, the Board concluded that the practice was in the public interest:

This practice stems from the fact that there is substantial reservations turnover before flight departure time occasioned by changes in passengers' plans and cancellation of their reservations. In addition, the practice is used to allow for multiple reservations made by some passengers and for "no-shows"—passengers who neglect to cancel reservations they do not intend to use. Reservations turnover can be projected and compensated for by booking in excess of the capacity of the aircraft to a predetermined extent. By carefully controlling overbooking in this manner on certain flights, carriers can reduce the chance of aircraft departing with empty seats. At the same time, through the carriers' acceptance of reservations in excess of inventory, passengers

are able to secure space on flights which can in fact accommodate them and are also benefited by being offered maximum flexibility in securing, cancelling and changing reservations without charge or penalty. However, where carriers overestimate reservations turnover on a particular flight, overbooking can result in oversales and passengers holding confirmed reserved space are denied boarding.

\*   \*   \*   \*   \*   \*

[W]ere the carrier prevented from overbooking, large numbers of passengers would be denied reservations on flights which, because of reservations turnover and "no-shows", would depart with empty seats.

In our view, any realistic appraisal of the practice of overbooking leads to the conclusion that, while it results in oversales, it also contributes to flexibility and freedom in securing, changing, and cancelling reservations. Thus, any rigid controls over overbooking, as now practiced, would inevitably lead to restrictions on privileges which contribute greatly to the convenience of air transportation, and have come to be relied upon by the traveling public. In addition such controls would reduce load factors, and the additional cost would ultimately have to be borne by the traveling public.

In light of the above, it can be seen that the present reservations systems of the carriers in general benefit the traveling public. 32 *Fed.Reg.* 460, 461.

This case presents two questions: (1) was Allegheny liable to Nader in tort for fraudulent misrepresentations? and (2) assuming such liability was the award of punitive damages proper? We first address the second question and conclude that assuming liability the award of punitive damages was clearly erroneous.

■ The Civil Aeronautics Board in 1967 had publicly and formally expressed its approval of the practice of overbooking and had declined to issue a rule requiring notice to holders of tickets for an overbooked flight. As we observed in the first *Nader* case, 167 U.S.App.D.C. at 358, 512 F.2d at

535, the Board's determination to permit the carriers to continue the practice of nondisclosure was based on the recognition that disclosure "would create anxiety and confusion in the public, would cause the public to make a great number of duplicative and protective reservations, would produce a rapid turnover in reservations within the twenty-four hours before the departure of a flight and would increase the no-show problem." The Board concluded that "any rigid controls over overbooking, as now practiced, would inevitably lead to restrictions on privileges which contribute greatly to the convenience of air transportation, and have come to be relied upon by the traveling public. In addition, such controls would reduce load factors and the additional cost would ultimately have to be borne by the traveling public." 32 *Fed.Reg.* at 461 (1967). In summary the Board stated that the reservation systems of the carriers "in general benefit the traveling public." *Id.* The Board had not modified or retreated from this position when Nader made his reservation in 1972. Allegheny's policies and practices as applied to Nader therefore carried the approval of the Board; and Allegheny must have believed that they were approved. Under these circumstances it was clearly erroneous to find as did the District Court that Allegheny's "policy of nondisclosure" was "willful and wanton" and showed a "conscious, deliberate and callous disregard" for its passengers. An airline may not be condemned as a wanton wrongdoer for conforming to the standards set and the practices approved by the agency charged with the duty of regulating it—standards and practices that the agency has found to be in the public interest. The award of punitive damages must be set aside.

A representation may be false and fraudulent in a technical sense, although it is not so gross and wanton that it justifies an award of punitive damages. We therefore turn to the question whether Allegheny was guilty of fraudulent misrepresentation in failing to disclose to Nader that his "confirmed reservation" was subject to the contingency that he might be denied boarding if his flight was overbooked.

The elements of the tort of fraudulent misrepresentation are (1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) and with intent to deceive, (5) with action taken in reliance upon the representation. *Nader v. Allegheny Airlines, Inc.*, 167 U.S.App.D.C. at 364 n. 32, 512 F.2d at 541 n. 32 (1976).

In the first *Nader* case we reversed as clearly erroneous the District Court's finding that Allegheny affirmatively represented to Nader that he had a reservation guaranteeing him a seat. *Id.* at 365, 512 F.2d at 542. We held that Allegheny's fault, if any, was its failure to disclose that its policy of deliberate overbooking qualified the meaning of a "confirmed reservation". The District Court found that Allegheny had a duty of disclosure to Nader, that its failure to disclose amounted to a false representation, and that by a preponderance of the evidence Nader had proved the other elements of the tort of fraudulent misrepresentation.

The record discloses that in the seventeen months preceding the Nader incident Allegheny had experienced only two oversales on flight 864, and statistical analyses had shown that in 1972 there was only slightly more than one chance in two thousand that a ticket holder would be denied boarding because of an oversale. Stated another way the chance that a holder of a confirmed reservation would be boarded was approximately 99.95 out of 100. Allegheny argues that because the chance that Nader would be denied boarding was thus "so negligible as to be practically insignificant" the possibility that bumping might occur was not a material fact and the airline cannot be charged with misrepresentation in failing to disclose it. The theory of the airline is that a confirmed reservation is not a guarantee but is only a "reasonable assurance" of being flown, because any flight may be cancelled as the result of weather conditions, mechanical problems, or the like. The airline says that Nader had that reasonable assurance of being flown; the chance of being bumped because of overbooking was too remote to affect the assurance, and

silence about such a chance therefore did not amount to a false representation in reference to a material fact. As the District Court found, however, confirmation of a reservation connotes a guarantee of flight subject only to contingencies beyond the control of the airline. The possibility of being bumped because of overbooking is a factor within the airlines' control. That the possibility may be slight does not make it immaterial; it is still a factor in the equation, and as Nader's experience demonstrates it may be an important factor. No one who has suffered the disruption of travel plans by denial of boarding would believe otherwise.

Six years after the Nader incident the Civil Aeronautics Board confirmed our opinion that the practice of overbooking is a material fact which should be brought to the attention of those purchasing tickets. This the Board did by promulgating 14 C.F.R. § 250.11, 43 Fed.Reg. 24,284 (1978). This regulation requires carriers to post in their ticket offices and include with each ticket sold a notice that "Airline flights may be overbooked, and there is a slight chance that a seat will not be available on a flight for which a person has a confirmed reservation."

Nader could not recover on his tort claim unless the evidence established that Allegheny intended to deceive him when it failed to notify him of its overbooking practice. The District Court found in summary fashion that Allegheny had such an intent to deceive. The court's entire discussion of this issue was:

There can be no doubt that the nondisclosure of the existence of defendant's overbooking practice was the result of a conscious and deliberate policy implemented by Allegheny in order to deprive passengers of information about its overbooking practice so as not to distinguish Allegheny's reservation practices from those of its competitors.

445 F.Supp. at 175. We think this finding is unsupported by the evidence and clearly erroneous.

As we have seen the matter of overbooking had been thoroughly explored by the

Civil Aeronautics Board in public hearings. In public comments filed in those proceedings Allegheny had acknowledged its practice of overbooking and explained its benefits. The record discloses that the Board's Office of Consumer Affairs had issued and distributed 400,000 copies of a booklet on consumers' rights in air travel which covered the subject of denied boarding. Overbooking had been discussed in periodicals of general circulation.[1] The Board had promulgated rules published in the Code of Federal Regulations and specifically designed to address situations caused by the practice of overbooking. 14 C.F.R. § 250 (1972). In short, the practice of overbooking in the air transportation industry was public information, openly discussed by the carriers, the Board and publications of national circulation. In the light of these facts we cannot accept the District Court's conclusion that Allegheny's failure to notify Nader of its overbooking practice was motivated by deceit and the desire to deprive him of information. The practice of overbooking was no secret, no covert operation, but was openly carried on, and Allegheny was entitled to believe that any knowledgeable passenger knew of the practice. The court's findings that Allegheny harbored an intent to deceive is, we think, contrary to the evidence. An airline which intends to deceive by concealing facts does not advertise the facts in public proceedings.

■ Moreover, in order to recover for the tort of fraudulent misrepresentation:

The false representation must have played a material and substantial part in leading the plaintiff to adopt his particular course; and when . . . it is clear that he was not in any way influenced by it, . . . his loss is not attributed to the defendant.

In order to be influenced by the representation, the plaintiff must of course have relied upon it, and believed it to be true. If it appears that he knew the facts, or believed the statement to be false, or that he was in fact so skeptical as to its truth that he reposed no confidence in it, it cannot be regarded as a substantial cause of his conduct. [footnotes omitted]

W. Prosser, Law of Torts § 108 at 714 (4th ed. 1971). The plaintiff Nader was an extraordinarily knowledgeable passenger, an able lawyer and a famous and distinguished advocate of consumer rights, including the rights of airline passengers. On April 23, 1972, only two days before he made his reservation on Allegheny flight 864, Nader was bumped from an American Airlines flight. Six months earlier he had been bumped by Eastern Airlines. On both occasions he held a confirmed reservation. In addition, upon being told that he could not be accommodated on flight 864 because all the seats were occupied, and being tendered the Denied Boarding Form required by CAB regulations, Nader informed the Allegheny ticket agent that he was familiar with the form. On deposition Nader explained that he told the agent he did not need the form because "I already knew what it said". In fact he had received such a form when he was bumped from the American Airlines flight. The form stated:

Tariffs filed by this carrier with the Civil Aeronautics Board provide denied boarding compensation to a passenger holding confirmed reserved space where the flight for which the passenger holds such space is unable to accommodate him and departs without him. [See 14 C.F.R. § 250.9 (1972)]

Therefore, the evidence demonstrates that Nader "knew the facts" that a confirmed reservation did not exclude the possibility that he might not be boarded. "[O]ne who has special knowledge, experience and competence may not be permitted to rely on

1. See Ruppenthal, K.M., "Bumping the Passenger," Nation, June 25, 1960, at 551–53; " He who got bumped," Time, February 2, 1962, at 50; "Bumpy Departures on the Airlines: Failure to Honor Reservations," Consumer Reports, November 1967, at 565–66; "Board Proposes Hike in Airline Overbooking Penalties," Aviation Week and Space Technology, January 23, 1967, at 39; "CAB Tightens Enforcement on Oversales," Aviation Week, June 29, 1970, at 28; "What Are Your Rights When You Buy a Plane Ticket," Better Homes and Gardens, January 1972, at 10; "CAB Finds Denied Boarding Cut in 1972," Aviation Week, February 14, 1972, at 32.

statements for which the ordinary man might recover." *See* W. Prosser, *supra* at 717. It cannot be said that Nader relied on his confirmed reservation with Allegheny as a guarantee of passage.

The judgment for both compensatory and punitive damages is

*Reversed.*