884 F.2d 1387
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Paul D. BRIDGES, Plaintiff-Appellant,
v.
NATIONWIDE MUTUAL INSURANCE COMPANY, Nationwide Mutual Fire
Insurance Company, Nationwide Life Insurance
Company, Defendants-Appellants.
 No. 88-2531.
 United States Court of Appeals, Fourth Circuit.
 Argued March 9, 1989.
Decided Aug. 17, 1989.
Rehearing and Rehearing In Banc Denied Sept. 8, 1989.
 
 Anthony Randall Veneri for appellant.
 David L. White (Sanders, Watson & White on brief) for appellees.
 Before WIDENER, PHILLIPS, and WILKINS, Circuit Judges.
 PER CURIAM:
 
 
 1
 Paul D. Bridges appeals a final order of the district court granting summary judgment in favor of the defendant, the Nationwide Mutual Insurance Company (Nationwide), on all eight counts of Bridges' amended complaint, wherein he charged Nationwide with, inter alia, wrongful discharge, fraud, tortious interference with future employment and intentional infliction of emotional distress.[1] We affirm.
 
 
 2
 * On March 8, 1984, Nationwide terminated its employment contract with Bridges, who had served for the preceding twenty-four years as a Nationwide sales representative and broker in southern West Virginia. That event directly precipitated this lawsuit; but the appellant's various claims involve far more than the immediate circumstances surrounding his discharge. For the sake of convenience, we will therefore set out the salient facts of the case as they relate to each separate count of the amended complaint.
 
 
 3
 A. Wrongful Discharge.
 
 
 4
 The plaintiff's claim here arises from Nationwide's alleged "retaliatory" response to his efforts to secure claims adjustments from the company under a fire insurance policy Bridges sold to one Oscar Dalton. On February 18, 1984, a fire engulfed and completely destroyed Dalton's home. Dalton called Bridges for assistance; and on February 21st, the pair visited William Selby, a local Nationwide claims adjuster. Bridges asked Selby to authorize the immediate payment to Dalton of a "personal property advance" totalling some $5,000--the amount to which Dalton was apparently entitled, under the terms of his homeowner's policy, to cover his family's living expenses while Nationwide investigated the fire and the legitimacy of Dalton's policy claims. Selby purportedly "resisted," however, and Bridges now claims that he had to "force" Nationwide's claims adjustments department to cover Dalton's interim expenses.[2]
 
 
 5
 Two days later, on February 23rd, two Nationwide claims investigators visited Bridges' office and allegedly "demanded the Dalton file." Bridges claims that the investigators "persistently requested derogatory information ... regarding [Dalton] that did not exist." Appellant's Br. at 6. He concedes, as Nationwide insists, that "the two ... investigators did not directly ask him to lie," but alleges that they "did pressure him indirectly to generate derogatory and false information" about Dalton and the pending claim under his fire insurance policy. Id.
 
 
 6
 Nationwide terminated Bridges' agency contract only two weeks later, and the plaintiff now claims that he was discharged in "retaliation" for his efforts on behalf of Dalton. As Bridges would have it, he was simply attempting to "prevent and reveal" violations of West Virginia's "strong public policy" that, in the district court's words, "insurance claims be[] handled fully and fairly." Bridges v. Nationwide Insurance Co., C/A No. 1:86-0374, slip op. at 4 (S.D.W.Va. February 18, 1988). Thus, to the extent that Nationwide discharged Bridges in retaliation for his handling of the Dalton claim, it did so "wrongfully"--that is, in contravention of established public policy.
 
 
 7
 The district court granted Nationwide's motion for summary judgment, finding in the voluminous discovery record no genuine issue of material fact with respect to Bridges' claim that the company cancelled his agency contract in retaliation for his efforts on behalf of the Daltons. In the court's view, Bridges had failed to introduce competent evidence that Nationwide in any sense "breached public policy" in connection with its investigation of the Daltons' claim--or that, in any event, there was a "causal connection" between Bridges' dispute with Nationwide over the ongoing Dalton investigation and the company's ultimate decision to cancel his agency contract.
 
 
 8
 Plaintiff points to no evidence ... which indicates that Defendants did not fairly deal with the [Dalton] claim. It is well established that an insurance company has a right to investigate claims made on their policies. Hayseeds, Inc. v. State Fire and Cas., 352 S.E.2d 73 (W.Va.1986). All of the evidence pointed to by Plaintiff on this count indicates that the Defendants were exercising their right to investigate the Dalton claim.
 
 
 9
 * * *
 
 
 10
 * * *
 
 
 11
 Plaintiff has [also] failed to produce any competent evidence that he was terminated because of his action in the Dalton claim or that his actions revealed or prevented deceptive and unlawful acts of the Defendant. Defendant on the other hand has provided evidence the Plaintiff's termination was unrelated to this [claim,] and that it did not commit any deceptive or unlawful acts. Plaintiff has [therefore] failed to prove that his termination was retaliatory and wrongful in violation of any public policy.
 
 
 12
 Id. at 4-5. Bridges now of course protests that the discovery record did in fact leave open to question both whether Nationwide discharged him in retaliation for his efforts on behalf of policyholders, and whether Nationwide's handling of the Dalton claim indeed "violated public policy."
 
 
 13
 B. Fraud.
 
 
 14
 1. Count V of Bridges' second amended complaint charged Nationwide with common law fraud in connection with an ongoing dispute over the company's liability un der a "fidelity bond" covering one Anita Bishop, who was Bridges' secretary. S ometime in the summer of 1983, Bishop allegedly embezzled more than $5,000 from Bridges' business accounts.[3] Then, early in 1984, Bridges filed a claim with Nationwide under the fidelity bond, seeking full reimbursement for the los t funds.
 
 
 15
 After an internal investigation and audit, Nationwide's claims adjusters concluded that Bridges' claim was worth "no more than" $100, and the company therefore tendered a settlement check in that amount. Bridges now claims that Nationwide offered this "nominal" amount not on the basis of a determination of how much was actually missing from the accounts, but instead because its investigators believed that Bridges, rather than Bishop, had actually misappropriated the missing funds. In turn, Bridges charges Nationwide with fraud, claiming that the company "misrepresented" the true reasons for its failure to compensate him fully for the alleged loss, and that he "detrimentally relied" on that misrepresentation.
 
 
 16
 The district court granted Nationwide's motion for summary judgment on this claim as well, finding in the discovery record no evidence that Bridges had actually "relied" on the alleged misrepresentation--or that he had, in any event, suffered damages as a result.
 
 
 17
 The Court has exhaustively scrutinized the evidence presented by Plaintiff in the form of exhibits, testimony and affidavits[,] as well as the pleadings and memoranda filed. The Court cannot glean from any documents exactly how Plaintiff relied on any acts of the Defendant in the fidelity bond claim settlement. Plaintiff has testified that he knew the minute he received the $100.00 check that the audit was not correct. Thus, Plaintiff never relied on any acts of the Defendants. Plaintiff states in his memoranda that he relied on Defendants to conduct a proper investigation and audit of the embezzlement by his secretary, Mrs. Bishop. However, according to the Plaintiff's own testimony he never believed or relied on the fact that the correct amount embezzled by Mrs. Bishop was $100.00. Thus, on this portion of Plaintiff's fraud claim the essential element of reliance on an allegedly deceptive act of Defendants has not been pleaded or proven.
 
 
 18
 Bridges v. Nationwide Mutual Insurance Co., C/A No. 1:86-0374, slip op. at 4 (S.D.W.Va. March 30, 1988).
 
 
 19
 2. Bridges complicated matters further by alleging, also in Count V of his amended complaint, that the "true reason" for Nationwide's decision to cancel his agency contract lay in its management's belief that Bridges, rather than Bishop, had embezzled the funds missing from the agency accounts. Nationwide concedes that, at first, it justified Bridges' termination on the ground that he had misappropriated company funds and filed a fraudulent claim under the fidelity bond. The company later changed its position, however, and now maintains that it dismissed Bridges for reasons unrelated to the dispute over the bond settlement.
 
 
 20
 In the district court's view, it was in turn open to dispute whether, as claimed, the company "misrepresented" its reasons for cancelling Bridges' employment contract. Even if Nationwide's management had "deceived" the plaintiff, however, he had once again failed to show any "detrimental reliance," and therefore could not hope to prevail on the underlying fraud claim.
 
 
 21
 Plaintiff ... alleges that he was terminated as a result of the alleged misappropriation. Even assuming this as true, Plaintiff has failed to show [detrimental] reliance on any act by defendant which resulted in his termination.
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 [S]hould plaintiff be able to show he relied on Defendant's misrepresentation that Plaintiff had been terminated due to misappropriation, no detriment has been suffered by the Plaintiff inasmuch as ... [he] was terminated regardless of the reason expressed....
 
 
 25
 * * *
 
 
 26
 * * *
 
 
 27
 Therefore, Plaintiff has failed to show at least one of the essential elements of a fraud claim in his allegations regarding his termination.
 
 
 28
 Id. at 4-5. Bridges now claims that the district court misapprehended the nature of his complaint. The underlying "fraud" purportedly lay not in any misrepresentation about the Nationwide's "true reasons" for cancelling his agency contract, but instead in its failure to "investigate fully" Bridges' claims under the fidelity bond covering Ms. Bishop. Had the company conducted a proper investigation, we are now told, it would have realized that Bridges was not at fault, and would in turn have renewed his contract.
 
 
 29
 C. Tortious Interference with Future Employment.
 
 
 30
 Here, Bridges challenges the enforceability of the following provision of his agency contract with Nationwide:
 
 
 31
 All liablity of [Nationwide] for [the] Agent's [Deferred] Compensation provided for [herein] shall cease and terminate in the event any one or more of the following shall occur:
 
 
 32
 (1) You [the Agent] either directly or indirectly by and for yourself or as an agent for another, or through others as their agent, engage in or be licensed as an agent, solicitor, representative, or broker or in any way be connected with the fire, casualty, health, or life insurance business, within one year following cancellation [of this Agreement,] within a 25-mile radius of your business location at that time....
 
 
 33
 Agency Agreement p 11(f), reproduced in Joint Appendix at 77. Bridges claimed that this provision constituted an unlawful restrictive covenant not to compete, hence a "tortious interference" with his right to secure new employment.
 
 
 34
 The district court disagreed. "It is clear from this provision that Defendants could not restrict Plaintiff from engaging [in] his former occupation. Defendants merely set as a condition of Plaintiff receiving his [Deferred] Compensation upon termination that he not compete within the same geographical area for one year. A restrictive covenant not to compete would absolutely prohibit Plaintiff from engaging in his occupation." Bridges v. Nationwide Insurance Co., C/A No. 1:86-0374, slip op. at 2 (S.D.W.Va. February 18, 1988).
 
 
 35
 * * *
 
 
 36
 * * *
 
 
 37
 Having granted Nationwide's motions for summary judgment on each of Bridges' claims, the district court dismissed the amended complaint with prejudice. This appeal followed.
 
 II
 
 38
 In support of his wrongful discharge claim, Bridges invokes West Virginia's "public policy" exception to the "at will employee" doctrine. Under that state's common law, "the rule giving the employer the absolute right to discharge an at will employee must be tempered by the further principle that where the employer's motivation for the discharge contravenes some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by the discharge." Harless v. First Nat'l Bank in Fairmont, 246 S.E.2d 270, 275 (W.Va.1978). See also Pritchett v. Affinity Mining Co., 356 S.E.2d 18, 20 (W.Va.1987); Stanley v. Sewell Coal Co., 285 S.E.2d 679, 682 (W.Va.1982); Shanholtz v. Monongahela Power Co., 270 S.E.2d 178, 181 (W.Va.1980). As indicated, Bridges' claim here is that Nationwide terminated his agency contract in "retaliation" for his vigorous pursuit of the policy claims of one of his clients--hence in derogation of West Virginia's manifest public policy in favor of the "full and fair settlement" of insurance disputes.
 
 
 39
 Nationwide does not dispute either that, as Bridges argues, the "legislative purpose" of West Virginia's insurance claims statute is "to prevent improper settlement practices," or that the state adheres to a strong public policy of "encouraging [the] prompt settlement of meritorious claims." Jenkins v. J.C. Penney Casualty Ins. Co., 280 S.E.2d 252, 258 (W.Va.1981).[4] Implicitly, Nationwide also concedes that, had it fired Bridges in retaliation for his attempts to secure immediate settlement of a policyholder's meritorious claims, it would be liable on the stated "wrongful discharge" claim. The only question here, therefore, is whether there was any genuine issue of material fact with respect to Bridges' core allegation that he was terminated as a result of his handling of Oscar Dalton's fire insurance claim.
 
 
 40
 We think the extensive summary judgment record developed in this case bears out the district court's conclusion that, in the end, Bridges "failed to produce any competent evidence that he was terminated because of his actions in the Dalton claim[,] or that his actions revealed or prevented deceptive and unlawful acts of the Defendant." Taking all of the deposition testimony, the affidavits and the voluminous documentary evidence in the light most favorable to Bridges, it appears that Nationwide might well have "resisted" payment on the Dalton claim. And as Bridges repeatedly emphasized, some evidence in the record strongly suggests that Nationwide was highly "suspicious" of the circumstances surrounding the fire at Oscar Dalton's home. There is presented here, however, no competent evidence whatsoever of a "causal connection" between the parties' alleged dispute over the Dalton matter and Nationwide's ultimate decision to terminate Bridges' agency contract.
 
 
 41
 The plaintiff claimed at his second deposition that a Nationwide supervisor, Ashley Cowder, specifically told Bridges that the company was terminating him because he had been "too pro-policy holder and anti-company." J.A. at 512. As Bridges tells the story, Cowder made specific reference to the Dalton claim, telling Bridges that "[y]ou wouldn't even cooperate with our investigators that come by your office, to give them any derogatory or incriminating information about the Daltons to enable the company to deny or reduce the claim." Id. Even assuming that the conversation between Cowder and Bridges took place, however, Bridges' account would clearly be inadmissible hearsay. For unexplained reasons, and despite the fact that the parties conducted discovery over a ten-month period, Bridges failed to take Cowder's deposition. More importantly, Bridges' testimony about his conversation with Cowder is the only suggestion in the record of a "causal link" between Bridges' handling of Dalton's claim and Nationwide's decision to cancel Bridges' agency contract.
 
 
 42
 Bridges' deposition stands, moreover, in stark contrast to substantial evidence introduced by Nationwide, all of which strongly suggests that Bridges was terminated for reasons completely unrelated to the Dalton dispute. He apparently refused, for example, to participate in a number of required "loss ratio control" programs. According to Nationwide's records, Bridges also wrote policies on which there were a disproportionate number of net losses to the company, and made an inordinate number of claims on his personal insurance with the company. More generally, Bridges' business was, at the time of his discharge, in a manifest state of disarray. Indeed, documents introduced by Nationwide suggested that, long before the Dalton dispute developed, company management had become concerned about Bridges' general lack of profitability and failure to operate his agency according to "normal business practice."
 
 
 43
 This evidence collectively suggests, of course, that Nationwide had ample, bona fide reasons--as it now claims--to "cut its losses" by terminating the plaintiff's agency contract and revoking his brokerage license. That said, and for the more important reason that there simply is no evidence in the record to substantiate Bridges' claim that he was fired for manifesting a "pro-policyholder" bias, we will affirm the district court's summary judgment dismissal of the retaliatory discharge claim.
 
 III
 
 44
 As indicated, Bridges makes two separate "fraud" claims: first, that Nationwide "misrepresented" its true reasons for terminating his agency contract; and second, that the company failed to conduct a "full and fair" investigation of Bridges' fidelity bond claim. We may assume, for the sake of argument, that there is some truth to these allegations; but we are nevertheless persuaded that, as the district court held, they fail to support a cause of action for common law fraud.
 
 
 45
 * Under West Virginia law, "[t]he essential elements in an action for fraud are: '(1) that the act claimed to be fraudulent was the act of the defendant[,] or [was] induced by him; (2) that it was material and false; [ (3) ] that the plaintiff relied upon it and was justified under the circumstances in relying upon it; and [ (4) ] that he was damaged because he relied upon it.' " Romano v. New England Mutual Life Ins. Co., 362 S.E.2d 334, 340 (W.Va.1987) (quoting Lenqyel v. Lint, 280 S.E.2d 66, 69 (W.Va.1981) and Horton v. Tyree, 139 S.E.737, (W.Va.1927)). Here, the plaintiff's fraud claims suffer from an obvious, fatal defect. As the district court recognized, Bridges simply failed to allege or show either that he ever "relied"--at least to his detriment--on the defendant's alleged misrepresentations, or for that matter that he thereby suffered any damages.
 
 
 46
 Put another way, the difficulty here is that the record simply admits of no "causal connection" between the purported fraud and the "wrongs" about which the plaintiff complains--viz., the company's decision to cancel his agency contract and its failure to compensate him "fully" under the Bishop fidelity bond. Taking up the first claim, we may assume--again only for the sake of argument--that Nationwide did indeed "misrepresent" the true reasons for its decision to cancel Bridges' employment contract. We may also assume--though this requires a liberal construction of the pleadings and the evidence developed in discovery--that Bridges "relied" on this misrepresentation, at least in the sense that he believed all that he was told about the reasons for his discharge. Taking all of this to be true, the plaintiff still cannot claim that he was in any sense "injured" by the alleged fraud.
 
 
 47
 "[I]n order to recover for the tort of fraudulent misrepresentation ..., '[t]he false representation must have played a material and substantial part in leading the plaintiff to adopt his particular course; and when ... it is clear that he was not in any way influenced by it ..., his loss is not attributed to the defendant.' " Nader v. Allegheny Airlines, Inc., 626 F.2d 1031, 1037 (D.C.Cir.1980) (quoting W. Prosser, Law of Torts Sec. 108, at 714 (4th ed.1971)). Here, the alleged misrepresentation obviously bears no "causal" relationship to the alleged injury, inasmuch as the company's decision to discharge Bridges was a fait accompli at the time of the supposed fraud. The plaintiff simply cannot claim, therefore, that "the correct facts would have had a bearing on [his] action[s]." Castaneda-Gonzalez v. INS, 564 F.2d 417, 431 (D.C.Cir.1977). See also TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 445 (1976).
 
 
 48
 Where, as in this case, "[t]he alleged misrepresentation goes to the reason for [the] termination" of an employment relationship, and the alleged injury is the termination itself, the discharged plaintiff cannot hold his former employer liable for "fraud" on that basis. Moffet v. Gene B. Glick Co., 604 F.Supp. 229, 238 (N.D.Ind.1984). Thus, as in Moffet itself, the claim here fails for a simple reason. Whatever the expressed justification for the defendant's ultimate decision to cancel Bridges' agency contract, "the result was the same: [he] was fired." Id. Finding that the plaintiff failed to allege any "detrimental reliance," therefore, we must agree with the district court that he in turn stated no actionable claim of fraud.
 
 B
 
 49
 The same can be said for Bridges' claim that Nationwide fraudulently misrepresented the reasons for its refusal to pay more than a nominal amount in connection with the plaintiff's claim under the fidelity bond covering Anita Bishop. Even if Nationwide did not, as it insists, conduct a "full and fair" investigation of that claim, and even if Bridges was entitled to a larger settlement than the company ultimately tendered, the plaintiff's claim lay in contract, rather than tort. Here again, Bridges fails to claim that the alleged misrepresentation "had a bearing on [his] action[s]." Castaneda, 564 F.2d at 431. Indeed, he boldly concedes that, as the district court found, "he never believed or relied on the fact that the correct amount embezzled by Mrs. Bishop was $100.00." Bridges v. Nationwide Mutual Insurance Co., No. 1:86-0374, slip op. at 4 (S.D.W.Va. March 30, 1988).
 
 
 50
 In the face of such an admission--which here again is tantamount to a concession that the underlying fraud claim is not supported by the essential element of "detrimental reliance"--we of course cannot say that it was error for the district court to find in the record no genuine issues of material fact. We will therefore affirm the district court's summary judgment dismissal of this claim as well.
 
 IV
 
 51
 What remains is Bridges' claim that Nationwide's attempts to enforce the Deferred Compensation forfeiture provision of his agency contract constituted actionable "tortious interference with future employment."
 
 
 52
 On its face, the challenged contractual language is, as Bridges concedes, a "forfeiture provision." Unlike a "restrictive covenant," which directly prohibits future employment, the provision at issue here simply provides for the forfeiture of certain deferred compensation if the beneficiary obtains employment with a competing insurer during the twelve-month period following the termination, for any reason, of his or her agency contract. While the West Virginia Supreme Court has never addressed the question, several other courts have upheld the enforcement of similar provisions. The Virginia Supreme Court, for example, has squarely held that "extended earnings" forfeiture provisions found in insurance agency contracts may be enforced. Nationwide Mutual Ins. Co. v. Tatem, 173 S.E.2d 818, 820 (Va.1970), cited with approval in Rochester Corp. v. Rochester, 450 F.2d 118, 123-24 (4th Cir.1971).
 
 
 53
 In Rochester, we upheld the enforcement of contractual language providing for the forfeiture of vested pension benefits if the beneficiary engaged in "competitive employment" after retirement. Id. at 124. Of course, the case constitutes binding authority in this circuit; and we read it as standing for the broad proposition that forfeiture provisions like those challenged here are valid and enforceable.[5] That said, we will affirm the district court's holding that Nationwide's attempts to enforce the forfeiture provisions of Bridges' agency contract did not constitute a "tortious interference" his efforts to secure new employment.[6]
 
 V
 
 54
 For all of the above reasons, the judgment of the district court is affirmed.
 
 
 55
 AFFIRMED.
 
 
 
 [1]
 The district court had jurisdiction over the case by virture of the parties' diversity of citizenship. See 28 U.S.C. Sec. 1332. Bridges originally filed the lawsuit in West Virginia state court, but Nationwide sought and obtained removal to federal district court under 28 U.S.C. Sec. 1441(a)
 Bridges appeals the district court's summary judgment order only insofar as it disposed of his wrongful discharge, fraud, tortious interference and emotional distress claims. His amended complaint pleaded other, unrelated causes of action, none of which are at issue here.
 
 
 [2]
 The parties dispute whether Nationwide or its representatives indeed "resisted payment"; but Bridges concedes that he and Dalton left their meeting with Selby with an advance check in hand
 
 
 [3]
 A West Virginia criminal court ultimately convicted Bishop on misdemeanor and felony embezzlement charges. The state court found that she had "misappropriated" approximately $500 from Bridges' accounts
 
 
 [4]
 Bridges claims that three West Virginia statutes establish this "public policy" in favor of full and fair claims adjustment: W.Va.Code Secs. 33-11-1 et seq. (prohibiting certain "unfair trade practices" in insurance industry); 33-12A-1 et seq. (governing contractual relationships between insurance companies and their agents); and 46A-1-101 et seq. (general "consumer protection" statute). The parties do not appear to dispute that there is such a "general public policy" in West Virginia. Nationwide contends, however, that it did nothing to violate the general policy or any specific provisions of the West Virginia code
 
 
 [5]
 So far as we are aware, every other court to address the question has reached the same result and upheld the enforceability of forfeiture provisions. See, e.g., Cinelli v. American Home Products Corp., 785 F.2d 264, 266 (10th Cir.1986) (upholding forfeiture provision of deferred compensation plan on basis of "distinction between contract provisions which restrain competition and provisions which merely work a forfeiture of an economic advantage") (citing Rochester ); Golden v. Kentile Floors, Inc., 512 F.2d 838, 843 (5th Cir.1975) (upholding forfeiture provision on ground that it did not "preclude" post-termination employment); Austin v. House of Vision, Inc., 404 F.2d 401, 403 (7th Cir.1968) (same)
 
 
 [6]
 As indicated, Bridges also appeals the summary judgment dismissal of his "intentional infliction of emotional distress" claim. In Count VIII of his amended complaint, however, the plaintiff alleged only that, as a result of other alleged tortious acts, Bridges "sustained embarrassment and humiliation[,] great mental pain, anguish and suffering." Second Amended Complaint, Count VIII, p 2, reproduced in Joint Appendix at 41. By its terms, therefore, Bridges' emotional distress claim depended on the threshold viability of his other causes of action--none of which survived Nationwide's various motions for summary judgment. That said, and in light of our holding that the district court properly disposed of the plaintiff's wrongful discharge, fraud and "tortious interference with future employment" claims, we must in turn affirm the separate dismissal of Count VIII of the amended complaint